UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

    vs.                                                      1:20-CR-28
                                                                 (MAD)

MICHAEL J. RADCLIFFE a/k/a MYSTICAL,

                      Defendant.
_____

APPEARANCES:                                      OF COUNSEL:

**OFFICE OF THE UNITED STATES**       **MICHAEL S. BARNETT, AUSA**
**ATTORNEY – ALBANY**                    **EMILY C. POWERS, AUSA**
445 Broadway, Room 218
Albany, New York 12207-2924
Attorneys for the Government

**OFFICE OF THE FEDERAL PUBLIC**    **MATTHEW E. TRAINOR, ESQ.**
**DEFENDER – ALBANY OFFICE**
Northern District of New York
39 North Pearl Street, 5th Floor
Albany, New York 12207
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      On January 22, 2020, Defendant Michael J. Radcliffe, Jr., was charged by indictment with conspiracy to commit computer fraud in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and 1030(c)(4)(B)(i). *See* Dkt. No. 1. Currently before the Court is Defendant's motion to suppress statements that he made to law enforcement during the execution of a search warrant on October 2, 2018. *See* Dkt. No. 19. For the following reasons, Defendant's motion is denied.

## II. BACKGROUND

On March 16, 2021, the Court held a suppression hearing.  At the hearing, the Government called Federal Bureau of Investigation ("FBI") Agent Marc Smith, Agent Timothy Lambia.  *See* Dkt. No. 53 at 3, 124.  Defendant called FBI Agent Jennifer Vander Veer, Michael Radcliffe, Sr., Michele Constable, and Alexzandra Radcliffe.  *See id.* at 68, 81, 152, 173.

The hearing testimony demonstrated that on October 2, 2018, law enforcement executed a search warrant on Defendant's residence.  *See id.* at 5-6.  Present during the search were multiple members of Defendant's family.  *See id.* at 28-29; Government's Exhibit ("Gov. Ex.") 5.  During the execution of the search warrant, Defendant was interviewed by multiple agents regarding his knowledge of and involvement in computer intrusion crimes.  *See* Gov. Ex. 3.  Defendant seeks the suppression of his statements to law enforcement during that interview, arguing that agents failed to inform him of his rights pursuant to *Miranda v. Arizona* prior to interrogation and denied him access to counsel despite repeated requests.  *See* Dkt. No. 19 at 1.  In opposition, the Government argues that Defendant was never in custody and, thus, *Miranda* warnings were not necessary and, alternatively, that Defendant never invoked his right to counsel.  *See* Dkt. No. 30 at 2.

## III. DISCUSSION

"Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights." *United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).  "'[C]ustody' for *Miranda* purposes is not coterminous with ... the colloquial understanding of custody." *Id.* at 135 (quoting *United States v. FNU LNU*, 653 F.3d 144, 152-53 (2d Cir. 2011)).  "In determining whether a suspect was in custody, a court looks at all the surrounding circumstances.  The relevant inquiry is

'how a reasonable man in the suspect's position would have understood his situation.'"  *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).  The Second Circuit has provided an objective test to determine whether someone is in custody, which asks "(1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'"  *Id.* (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)).

"An individual who understands that her detention is 'not likely to be temporary and brief' and feels that she is 'completely at the mercy of police' could reasonably deem her situation comparable to formal arrest."  *Id.* (quoting *Newton*, 369 F.3d at 675).  The Second Circuit has identified various factors for courts to consider to determine whether someone is in custody, including:

> (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

*Id.* (quotations omitted).

In support of his argument that he was in custody during the interrogation, Defendant cites to the fact that he was not able to retrieve water or go the bathroom on his own.  *See* Dkt. No. 19-1 at 9.  Defendant also claims that he was handcuffed for more than an hour.  *See id.* at 9-10.

At the suppression hearing, the testimony demonstrated that a team of approximately twenty agents executed a search warrant at Defendant's residence beginning at approximately 7:00 a.m.  *See* Dkt. No. 53 at 5-6, 9.  Agents armed with long guns approached the front door of Defendant's residence, knocked, and announced their presence.  *See id.* at 16, 19; *see also*

3

Defendant's Exhibit ("Def. Ex.") 1.  Defendant's mother answered the door, followed closely by Defendant's father.  *See* Dkt. No. 53 at 20.  Agents then began to clear the house prior to the search.  *See id.* at 23-24.

Agent Smith testified that when law enforcement first encountered Defendant, he was laying in his bed.  *See id.* at 24.  Upon first contact, Defendant's hands were covered by a blanket.  *See id.* at 24-25.  Law enforcement instructed Defendant to show his hands, but he was not complying with instructions.  *See id.* at 24-25.  Defendant's non-compliance lasted for less than one minute, during which law enforcement had their firearms pointed at Defendant.  *See id.* at 24-25, 27-28.  Eventually, Defendant was handcuffed by law enforcement and escorted to sit with his family.  *See id.* at 25-27.

Agents testified that Defendant and his family members were told that they were free to leave, but that once they left the house they would not be permitted to return until the search was complete.[1]  *See* Dkt. No. 53 at 29, 37-38.  Defendant's father testified that he heard law enforcement tell Defendant that "[n]o one's getting arrested here today.  You're free to go whenever you want."  *See id.* at 90.  For the first time at the suppression hearing, Defendant's parents testified that Defendant asked agents if he could go down to the street to a nearby deli to purchase food and that his request was denied.  *See id.* at 90-91, 115.  Agent Lambie testified that he did not recall Defendant asking to leave the residence to go to a deli.  *See id.* at 137-38.  Finally, Defendant's parents testified that immediately prior to Defendant's interview with agents, they overheard Defendant ask for an attorney.  *See id.* at 91-92, 160, 169-70.  Defendant's parents testified that when agents denied Defendant's request for an attorney, he requested to have one of his parents present but that agents denied this request as well.  *See id.* at 91-92, 160, 169-70.

In assessing the *FNU LNU* and *Faux* factors, the Court finds that the following facts are supported by the credible evidence. First, the interrogation took place in Defendant's home and in an open room where his family members could view his interactions with law enforcement. *See* Dkt. No. 53 at 39-40, 91. Second, that the interview lasted approximately four hours. *See* Gov. Ex. 3. Third, both prior to and during his interview, Defendant was told that he was free to leave. *See* Dkt. No. 53 at 29, 37-38, 90; Gov. Ex. 3 at 10:05.40. Fourth, Defendant volunteered to answer the agents' questions and continued to do so during the course of the interview. *See* Gov. Ex. 3 at 10:19.40. Fifth, Defendant was not restrained during the interview.[2] *See* Dkt. No. 53 at 38. Sixth, although two of the three agents present during the interview were armed, there is no indication that their weapons were drawn. *See id.* at 130. Finally, upon completion of the search and interview, the agents departed without arresting Defendant.

Although a somewhat lengthy interview, the interview took place in Defendant's home and was in an entirely conversational tone. *See generally* Gov. Ex. 3. The agents offered Defendant water on multiple occasions and offered to get him warmer clothing.[3] Defendant and his family members were told that they were free to leave. *See* Dkt. No. 53 at 90; *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("Decisions in this circuit have emphasized that in the absence of

---

[1] In fact, Defendant's sister, Alexzandra Radcliffe, and at least one of Defendant's younger brothers left the house during the search. *See* Dkt. No. 53 at 33, 89, 177.

[2] The evidence indicates that Defendant was handcuffed immediately following his initial encounter with law enforcement. Dkt. No. 53 at 25-26. However, the restraints were removed prior to the interview, thereby weighing against a custody finding. *See id.*; *see also United States v. Familetti*, 878 F.3d 53, 61 (2d Cir. 2017).

[3] Although Defendant argues that the fact that he was not able to retrieve his own water is indicative of custody, the Court disagrees. During the interview, agents were still searching the home pursuant to a search warrant. *See generally* Gov. Ex. 3; *Faux*, 828 F.3d at 137 ("A reasonable person would understand that being accompanied in one's home by agents who are legally present to execute a search warrant is a sensible precaution and that (absent other

actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave") (citations omitted); *see also United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (same); *United States v. Green*, No. 12-cr-83, 2016 WL 3610331, *22 (W.D.N.Y. July 6, 2016) (citation omitted). Finally, upon review of the recording of the interview, Defendant presents as talkative, albeit somewhat guarded, and willing to answer the agents' questions. *See* Gov. Ex. 3 at 10:19.40. In fact, when asked by law enforcement whether there was anything else he wanted to share, Defendant suggested that the agents continue to ask questions and he would provide answers. *See id.*

Considering all of these facts, the Court finds that a reasonable person would have thought that he was free to leave and that Defendant's freedom was not curtailed to a degree that a reasonable person would associate with a formal arrest. Accordingly, the Court finds that Defendant was not in custody. Therefore, agents were not required to read Defendant his *Miranda* warnings. Further, because Defendant was not in custody when he allegedly invoked his right to counsel, the Court need not decide whether Defendant's request was unequivocal. *See United States v. Smith*, No. 12-CR-52, 2012 WL 5187922, *7 (D. Vt. Oct. 18, 2012) (citing to Second Circuit and Supreme Court case law holding that "a defendant can only invoke the Fifth Amendment right to counsel once it attaches in the context of custodial interrogation"); *McNeil v. Wisconsin*, 501 U.S. 171, 175-78 (1991) (noting that an individual's right to counsel attaches in the context of custodial interrogation or once a prosecution has commenced).

Alternatively, having heard the testimony and reviewed the evidence, the Court finds that Defendant did not invoke his right to counsel. Defendant's parents testified that they overheard Defendant ask for an attorney prior to his interview. *See* Dkt. No. 53 at 91-92, 160, 169-70. The

---

hallmarks of custody) freedom of action is not being curtailed 'to a degree associated with formal

credible evidence indicates that Defendant mentioned an attorney twice on October 2, 2018. *See id.* 53 at 34, 127-28, 146.  In both instances, Defendant asks agents whether he can or should have an attorney present – he did not state that he wanted to an attorney.  The parties agree that Defendant asked agents just prior to the interrogation "So am I allowed to have a lawyer?" *See* Dkt. No. 57 at 1; Dkt. No. 58 at 3.  The only other mention of an attorney is when Defendant asked the interviewing agents if he should have an attorney present for the "recap" of his statements.  *See id.* at 72-74; Gov. Ex. 3 at 8:48.32.  This type of question by a defendant has been found insufficient to constitute an unequivocal invocation of the right to counsel.  *See United States v. Paracha*, No. 03 CR 1197, 2004 WL 1900336, *5 (S.D.N.Y. Aug. 24, 2004) (citing *Diaz v. Senkowski*, 76 F.3d 61, 64-65 (2d Cir. 1996)); *United States v. Plugh*, 648 F.3d 118, 124-27 (2d Cir. 2011) ("Plugh's only statements — 'I am not sure if I should be talking to you' and 'I don't know if I need a lawyer' — were appropriately deemed ambiguous").  Regardless, soon after Defendant asked this question, agents told Defendant that he was free to do whatever he liked.  *See* Dkt. No. 53 at 78.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion (Dkt. No. 19) is **DENIED** in its entirety as set forth herein; and the Court further

---

arrest'") (quotation omitted).

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: April 29, 2021
       Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge